**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

**JIM JACOBS,**

                        **Plaintiff,**

       **v.**

**BERKSHIRE BANK,**

                       **Defendant.**

---

## COMPLAINT

Plaintiff Jim Jacobs, by his undersigned counsel, states the following as his Complaint against Defendant Berkshire Bank.

## NATURE OF ACTION

This action seeks to hold Berkshire Bank responsible for its gross failure to keep a depositor's funds safe from theft.  On three separate occasions, October 17, 2016, October 19, 2016, and October 24, 2016, in response to fraudulent emails sent by an imposter pretending to be Mr. Jacobs, Berkshire Bank sent large wire transfers totaling $1,406,000 to banks in Hong Kong, and debited the account of Mr. Jacobs for the wires.  By sending those wires to a location well-known in the banking industry as high risk for fraud without first taking any steps to verify the authenticity of the emails, Berkshire Bank failed in its most fundamental of all obligations – namely, to protect depositor accounts from fraud.  Berkshire Bank knew, or should have known, of the high risk inherent in using email to receive orders for fund transfers.  By failing to use commercially reasonable precautions to authenticate the emails purportedly from Mr.

Jacobs, and by then refusing to make Mr. Jacobs whole for the enormous losses resulting from those repeated failures, Berkshire Bank (i) violated statutory requirements imposed by the Electronic Funds Transfer Act, 15 U.S.C. § 1693, and its Massachusetts analogue, M.G.L. c. 167B § 18, which protect consumers from liability for fraudulent and unauthorized electronic fund transfers; (ii) alternatively, violated its obligation to establish reasonable security procedures for such transactions under section 4A of the Uniform Commercial Code, M.G.L. c. 106 § 4A (UCC § 4A); (iii) violated its contractual duty of good faith under UCC § 4A; and (iv) breached its fiduciary duties to Mr. Jacobs.

## PARTIES

1.      Mr. Jacobs is an individual who resides in Florida.

2.      Berkshire Bank is a Massachusetts corporation with its principal place of business located at 24 North Street, Pittsfield, Berkshire County, Massachusetts.

3.      Berkshire Bank is a regional bank with over 90 branch offices in Massachusetts, New York, Connecticut and Vermont.

4.      In its 2015 Annual Report, Berkshire Bank's parent holding company, Berkshire Hills Bancorp, reported total assets of close to $8 billion, deposits of approximately $5.6 billion, and boasted of earning "double digit" returns for its shareholders.

## JURISDICTION AND VENUE

5.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 as Count I arises under the Electronic Funds Transfer Act, 15 U.S.C. § 1693.

6.     This Court has pendent and supplementary jurisdiction over Counts II through V pursuant to 28 U.S.C. § 1367(A) because the claims contained in those Counts are so related to the claim within this Court's original jurisdiction that they form the same case or controversy, and because they derive from the same nucleus of operative facts with the claim contained in Count I.

7.     This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(1), because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

8.     Venue is proper in this district pursuant to 28 U.S.C. §1391 (b)(2) because, at all relevant times, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTS

9.     Mr. Jacobs established a personal account (the "Account") with Great Barrington Savings Bank, then based in Great Barrington, Massachusetts, at least as early as approximately 1980.

10.     Great Barrington Savings Bank merged with Berkshire County Savings Bank on or about May 1, 1997, and the merged bank's name was changed to Berkshire Bank.

11.     Over the years, Mr. Jacobs' Account with Great Barrington Savings Bank and then Berkshire Bank grew substantially, with Berkshire Bank enjoying the benefit of those significant deposits for many years.

12.     Ms. Terri Andersen, a longtime employee, first of Great Barrington Savings Bank and then of Berkshire Bank, came to act as Mr. Jacobs' personal banker at Berkshire Bank.

13.     In that role, Ms. Andersen, regularly facilitated Mr. Jacobs' banking transactions, including the initiation of both domestic and international wire transfers from the Account that could involve hundreds of thousands of dollars.

14.     As part of Mr. Jacobs' regular transactions with Berkshire Bank, he would, from time to time, contact Ms. Andersen by email during normal business hours in order to give her instructions to make a wire transfer from the Account.

15.     These emails were sent to Ms. Andersen at her Berkshire Bank email address.

16.     Ms. Andersen accessed and responded to those emails from her Berkshire Bank email address using Berkshire Bank computer equipment while at her Berkshire Bank office during her normal working hours at Berkshire Bank.

17.     Ms. Andersen was paid by Berkshire Bank for the time she spent facilitating wire transfers for Mr. Jacobs, including the time spent reviewing and responding to email requests for wire transfers sent to her at the bank.

18.     Berkshire Bank was aware of and authorized Ms. Andersen to provide these personal banking services to Mr. Jacobs, including her facilitation of wire transfers.

19.     Receiving and responding to emails from Mr. Jacobs directing her to cause wire transfers to be made from his Berkshire Bank Account fell within Ms. Andersen's scope of employment as a Berkshire Bank employee.

4

20.    Following its merger with Great Barrington Savings Bank, Berkshire Bank began charging Mr. Jacobs a fee for wire transfers sent or received by Mr. Jacobs through Berkshire Bank.

## Berkshire Bank Warned of Escalating Internet Fraud

21.    Commencing at least as early as 2001, Berkshire Bank was aware of, or should have been aware of, wide-spread and escalating Internet fraud involving fund transfers.

22.    In August 2001, the agencies of the Federal Financial Institutions Examination Council (FFIEC) (which included the Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, National Credit Union Administration, Office of the Comptroller of the Currency, and Office of Thrift Supervision) issued a guidance entitled "Authentication in an Internet Banking Environment," which "focused on risk management controls necessary to authenticate the identity of retail and commercial customers accessing Internet-based financial services."

23.    The guidance urged "[f]inancial institutions offering Internet-based products and services to their customers [to] use effective methods to authenticate the identity of customers using those products and services" with the authentication techniques "appropriate to the risks associated with those products and services."

24.    That guidance warned that "**single-factor authentication, as the only control mechanism, [was] inadequate in the case of high-risk transactions involving access to customer information or the movement of funds to other parties.**"

25.     In October 2005, the FFIEC agencies issued a supplement to this guidance, again warning of the "**increasingly hostile online environment**," and recommending that institutions "perform periodic risk assessments [at least once every twelve months] and adjust their control mechanisms as appropriate in response to changing internal and external threats."

26.     The agencies reported heightened "expectations regarding customer authentication, layered security, or other controls in the increasingly hostile online environment."

27.     The agencies defined "high-risk transactions" as "electronic transactions involving access to customer information or the **movement of funds to other parties**," and concluded that "**financial institutions should implement more robust controls as the risk level of the transaction increases**."

28.     The agencies further recommended that institutions use layered security programs, including "the use of **dual customer authorization** through different access devices."

### FBI Warns of More Sophisticated Internet Fraud

29.     As Internet fraud in the financial industry escalated and became more sophisticated, the Federal Bureau of Investigation (FBI) published additional announcements warning financial institutions of the need to take heightened precautions.

30.     In January 2015, the FBI released a public service announcement, describing the characteristics of a scam identified as "Business E-Mail Compromise," and offered specific suggestions for protection.

31.     The FBI warned about, and gave specific descriptions for recognizing, a sophisticated scam that targeted businesses working with foreign suppliers or businesses that regularly perform wire transfer payments.

32.     The FBI described one version of this scam, in which "[t]he e-mail accounts of high-level business executives . . . are compromised.  The account may be spoofed or hacked.  A request for a wire transfer from the compromised account is made to a second employee within the company who is normally responsible for processing these requests."

33.     In this announcement, the FBI warned that "[i]ndividuals responsible for handling wire transfers within a specific business are targeted," and that "[f]raudulent emails received have coincided with business travel dates for executives whose email were spoofed."

34.     The FBI urged implementation of protective measures that included establishing a **two-step verification process**, such as a telephone call, to verify all significant transactions.

35.     The FBI further urged the implementation of protective measures in responding to emails from those purporting to be authorized persons that included using the "Forward" option instead of the "Reply" option.

36.     About six months later, in June 2015, the FBI and the Financial Services Information Sharing and Analysis Center issued a second alert.

37.     The June 2015 fraud alert warned that "[m]ost of [these fraudulent email] incidents involve the compromise of an email account belonging to a business's

CEO/CFO, in order to send an e-mail to an employee with the ability to conduct wire transfers."

38.     To mitigate risk, the fraud alert urges, among other things, that dual-approval (for example, telephone authentication) for any wire transfer involving any new trading partners be implemented.

39.      Less than three months later, in August 2015, the FBI issued a third announcement, reporting the escalation of victims since October 2013, and warning that "**the majority of the transfers are going to Asian banks located within China and Hong Kong**."

Berkshire Bank's Knowledge of Risk

40.     Commencing as early as 2001, Berkshire Bank was aware of, or should have been aware of, the wide-spread use of Internet fraud to initiate unauthorized fund transfers.

41.     On information and belief, Berkshire Bank received multiple public announcements and alerts specifically warning of email fraud in connection with wire transfers.

42.     By October 2016, Berkshire Bank was aware of, or should have been aware of, increasingly sophisticated "spoofing" scams used to trick recipients into sending unauthorized wire transfers.

43.     By October 2016, Berkshire Bank was aware of, or should have been aware of, the need for "dual control" authentication of payment orders before sending any wire transfers pursuant to the orders.

44.     By October 2016, Berkshire Bank was aware of, or should have been aware of, the particularly high risk associated with wire transfers of funds to Asian banks located in Hong Kong.

45.     Berkshire Bank never warned nor notified Mr. Jacobs of any of these risks.

46.     Mr. Jacobs was not otherwise aware of the nature and prevalence of these sophisticated email scams used by imposters to commit this type of fraud.

47.     Notwithstanding its being aware of the escalating risks of communicating instructions for fund transfers by email, Berkshire Bank never provided Mr. Jacobs with any security protocols or procedures that Mr. Jacobs could use to avoid or minimize those risks.

48.     On information and belief, Berkshire Bank did offer such security protocols and procedures to other of its customers who sent wires both domestically and overseas.

### Berkshire Bank Falls for "Spoofing" Scam; Makes Unauthorized Transfers

49.     On Monday morning, October 17, 2016, returning from a vacation, Ms. Andersen arrived at her office at Berkshire Bank, and began reviewing her emails.

50.     At this time, Mr. Jacobs was traveling in Europe.

51.     In Ms. Andersen's Berkshire Bank inbox was an email addressed to her that purported to be from Mr. Jacobs.

52.     In fact, that email was from an imposter pretending to be Mr. Jacobs.

53.     The email, which Ms. Andersen received at or about 9:14 a.m., had as its subject heading "Agnes martin," and asked that Ms. Andersen arrange to wire $580,000 to a bank in Hong Kong.

54.     Attached to the email were wiring instructions.

55.     Neither the bank in Hong Kong (HangSeng Bank) nor the purported beneficiary (Jun Hong (HK) Trading Co. Limited) listed in those wire instructions were entities with which Mr. Jacobs had ever before transacted.

56.     The spoofed email falsely stated that Mr. Jacobs was in Europe for the "International Contemporary Art Fair." Not only was Mr. Jacobs not at that art fair, upon information and belief, there was no art fair by that name in Europe.

57.     No one from Berkshire Bank made any attempt to call Mr. Jacobs or take any other action to authenticate the email instruction before sending the wire to the bank in Hong Kong, a location well known in the banking industry to be high risk for fraudulent wire transfers.

58.     Rather, Berkshire Bank, relying only on the spoofed email, sent the wire to the bank in Hong Kong, and debited Mr. Jacobs' Account $580,000.00.

59.     The following morning, Tuesday, October 18, the imposter sent Ms. Andersen another email under the subject heading "Agnes Martin," asking (in odd, jumbled language) for "a bit of confirmation for the Hong Kong (Agnes Martin) wire as reference to the beneficiary." The imposter also asked Ms. Andersen to provide the current balance in Mr. Jacobs' Account.

60.     In response, Ms. Andersen confirmed the name and address of the beneficiary, and disclosed that the balance in the Account was $1,590,500.

61.     Mr. Jacobs was unaware of this exchange of emails, or of the $580,000 that Berkshire Bank had debited his Account in connection with the unauthorized wire it had sent to Hong Kong.

62.     On October 19, 2016, two days later, the October 17, 2016 wire was returned to Berkshire Bank (less $38.74).

63.     On information and belief, again without making any attempt to authenticate the original wire instruction, or to determine why the first wire had been returned, Berkshire Bank resent a $580,000.00 wire transfer to the same bank in Hong Kong.

64.     Mr. Jacobs was unaware of the first "bounced" wire on October 19, 2016, or of Berkshire Bank's decision to resend that wire later that same day.

65.     The following Monday morning, October 24, 2016, at approximately 9:38 a.m., Ms. Andersen received in her Berkshire Bank inbox another email purporting to be from Mr. Jacobs directing that an additional $826,000 be wired from his Account to a different bank in Hong Kong.

66.     Like the emails on October 17 and October 18, this email was not in fact from Mr. Jacobs but from an imposter.

67.     The October 24 email urged in uncharacteristic language that the funds be wired "swiftly in order for the payment to be received as soon as possible."

68.     As was the case with the October 17 wire instructions, neither the Hong Kong bank (DBS Bank) nor the beneficiary (Triptex Globe Limited) designated in the wire instructions were entities with which Mr. Jacobs had ever before transacted.

69.     No one at Berkshire Bank attempted to call Mr. Jacobs or take any other action to authenticate the October 24 payment order.

70.     Rather, Berkshire Bank sent another wire to this second bank in Hong Kong, and debited Mr. Jacobs' Account an additional $826,000.00.

71.     At the time, Mr. Jacobs was unaware of the October 24 fraudulent email and of the $826,000 that Berkshire Bank had debited his Account in connection with this wire.

72.     On Tuesday October 25, 2016, after returning from Europe, Mr. Jacobs spoke with Ms. Andersen at Berkshire Bank by telephone.  During this call, Mr. Jacobs learned for the first time of the unauthorized wires.  Mr. Jacobs immediately advised Ms. Andersen that he had not authorized the wires.

### Berkshire Bank Denies Responsibility for its Unauthorized Wires

73.      Soon after the fraud was discovered, Berkshire Bank told Mr. Jacobs that it would not accept responsibility for any portion of the unauthorized wires.

74.     Berkshire Bank told Mr. Jacobs that it was the Bank's position that when Ms. Andersen asked the wire department within Berkshire Bank to send the unauthorized wires, Ms. Andersen was acting as an agent of Mr. Jacobs, rather than as an agent and employee of Berkshire Bank, notwithstanding that Ms. Andersen took that action while at her Berkshire Bank office, during Berkshire Bank working hours, using Berkshire Bank equipment, on Berkshire Bank time, and with Berkshire Bank's knowledge and authority.

75.     When it made that statement, Berkshire Bank knew, or should have known, that Ms. Andersen was in fact acting within the scope of her employment at

Berkshire Bank in connection with the sending of the wires in that it knew, or should have known, that Ms. Andersen facilitated the transfers in her role as personal banker for Mr. Jacobs, for the benefit, at least in part, of her employer Berkshire Bank, and without intention to defraud, or otherwise improperly benefit in connection with those transfers.

76.     Berkshire Bank is therefore responsible for the actions of Ms. Andersen in connection with those transfers.

77.     Berkshire Bank knows that Mr. Jacobs had no knowledge of the fraudulent emails that instructed Ms. Andersen to make the wires, and that he had no personal involvement in the mistakes that Berkshire Bank made in response to those emails.

78.     Berkshire Bank has nevertheless refused to credit any part of the $1,406,000.00 it has debited against Mr. Jacobs' Account in connection with the unauthorized transfers.

### Berkshire Bank Pressures Mr. Jacobs to Waive his Rights

79.     Shortly after discovery of the fraud on October 25, 2016, a wire transfer supervisor at Berkshire Bank, Leonard O'Dea, told Mr. Jacobs that the Bank would attempt to recover the wired funds only if Mr. Jacobs agreed to execute a letter that Berkshire Bank had prepared requesting such action.

80.     That letter included unconscionable language that would have prejudiced the position of Mr. Jacobs, including a requirement that Mr. Jacobs "indemnify, defend and hold harmless" Berkshire Bank against any losses or costs that the Bank might incur in connection with its efforts to recover the stolen funds, **even if such loses were**

caused by the negligence, gross negligence, willful misconduct or bad faith of Berkshire Bank.

81.    No one from Berkshire Bank offered to explain to Mr. Jacobs the import of that language or suggested to Mr. Jacobs that he engage counsel before signing the letter Berkshire Bank had prepared.

82.    Shocked by Berkshire Bank's improper attempt to condition any effort to recover the funds on securing a waiver from Mr. Jacobs of rights against Berkshire Bank, Mr. Jacobs declined to sign Mr. O'Dea's letter.

83.    Instead, Mr. Jacobs handwrote a letter that same day confirming that the instructions to make the wires did not come from him, and asking Berkshire Bank to immediately credit his Account in the amount of the unauthorized wires.

### Berkshire Bank Stonewalls

84.    To date, Berkshire Bank has declined to identify precisely what steps, if any, it took to attempt to recover the unauthorized wires, when it made any such attempt, and why any such efforts proved unsuccessful.

85.    To date, Berkshire Bank has failed even to provide Mr. Jacobs with requested information about the unauthorized wires, and the history of his Account at Berkshire Bank.

86.    Despite due demand by Mr. Jacobs, Berkshire Bank has refused to credit Mr. Jacobs' Account with the amount of the unauthorized wires, causing a loss to Mr. Jacobs in the amount of $1,406,000.00, plus interest.

### COUNT I
### Electronic Funds Transfer Act 15 U.S.C. § 1693

87.    Mr. Jacobs repeats the allegations contained in Paragraphs 1 through 86.

14

88.     Mr. Jacobs established the Account at Berkshire Bank's predecessor bank as a personal account.

89.     Mr. Jacobs is therefore entitled to the protections of the Electronic Funds Transfer Act 15 U.S.C. § 1693 and its implementing Regulation E (collectively, the "EFTA") with respect to that Account.

90.     The October 17 and October 24 fraudulent emails were initiated through a computer.

91.     Those fraudulent emails purported to instruct and/or authorize Berkshire Bank to debit Mr. Jacobs' Account in the amount of the unauthorized wires.

92.     The unauthorized fund transfers that Berkshire Bank completed in furtherance of those fraudulent instructions were "unauthorized electronic fund transfers" within the meaning of the EFTA.

93.     Mr. Jacobs provided Berkshire Bank with both oral and written notification of the error immediately after he discovered the fraud.

94.     Accordingly, Mr. Jacobs has no liability for the unauthorized transfers under the EFTA.

95.     Berkshire Bank has violated the EFTA by (i) failing to timely report to Mr. Jacobs the full results of its investigation into the unauthorized transfers, and (ii) failing to credit the Account in the amount of those transfers.

96.     Mr. Jacobs is entitled to recover from Berkshire Bank (i) the full amount of the unauthorized transfers in the amount of $1,406,000.00, (ii) interest on that amount from the date of such transfers, and (iii) reasonable attorney's fees and costs incurred in enforcing his rights under the EFTA.

## COUNT II
### Massachusetts Electronic Branches and Electronic Funds Transfers Act
### M.G.L. c. 167B § 1 et seq.

97.     Mr. Jacobs repeats the allegations contained in Paragraphs 1 through 96.

98.     Mr. Jacobs is entitled to the protection of the Electronic Branches and Electronic Funds Transfers Act, M.G.L. c. 167B § 18 (the "Massachusetts EFTA").

99.     The electronic funds transfers from Mr. Jacobs' Account were unauthorized within the meaning of the Massachusetts EFTA.

100.     Mr. Jacobs immediately notified Berkshire Bank of the fraudulent emails and unauthorized fund transfers upon his discovery thereof.

101.     Mr. Jacobs therefore has no liability for the unauthorized transfers.

102.     Berkshire Bank has violated the Massachusetts EFTA by failing to credit the Account of Mr. Jacobs in the amount of the unauthorized fund transfers.

103.     Accordingly, Mr. Jacobs is entitled to recover from Berkshire Bank (i) the full amount of the unauthorized transfers in the amount of $1,406,000.00, (ii) interest on that amount from the date of such transfers, (iii) up to treble damages for Berkshire Bank's failure to timely correct the error resulting from the unauthorized transfers, and (iii) reasonable attorney's fees and costs incurred in enforcing his rights under the Massachusetts EFTA.

## COUNT III
### Liability under Uniform Commercial Code M.G.L. c. 106 § 4A;
### Failure to Establish Reasonable Security Procedure

104.     Mr. Jacobs repeats the allegations contained in Paragraphs 1 through 103.

105.    Mr. Jacobs did not authorize either of the two payment orders to the banks in Hong Kong.

106.    Mr. Jacobs did not engage in any activity that would cause Mr. Jacobs to be bound by the fraudulent payment orders.

107.    Berkshire Bank failed to establish commercially reasonable security procedures for the communication of payment orders from Mr. Jacobs to Berkshire Bank.

108.    Berkshire Bank knew, or should have known, that email communication alone was not a commercially reasonable procedure for receiving payment orders.

109.    Berkshire Bank knew, or should have known, that email communication was especially inappropriate for communicating payment orders for the transfer of large amounts to banks located in Hong Kong.

110.     Because the security procedures employed by Berkshire Bank in connection with the payment orders were not commercially reasonable, Berkshire Bank is liable for the loss associated with the unauthorized transfers under UCC § 4A.

111.    On information and belief, Berkshire bank knew, or should have known, that the return of the October 17 wire on October 19 raised additional concerns about the authenticity of the payment order, and should have taken additional steps to investigate and attempt to authenticate the original payment order.

112.    Berkshire Bank's failure to conduct such an investigation under these circumstances was commercially unreasonable.

113.    Mr. Jacobs has suffered damages in the amount of $1,406.000.00 plus interest as a direct and proximate result of Berkshire Bank's failure to use commercially

reasonable security procedures in connection with (i) its receipt of payment orders purportedly from Mr. Jacobs, and (ii) its failure to investigate the return of the October 17 wire, and authenticate the payment order before resending the October 17 $580,000.00 wire and thereafter sending the third $826,000.00 wire on October 24.

114.     Under UCC § 4A, Berkshire Bank is strictly liable to Mr. Jacobs in the full amount of those damages.

## COUNT IV
### Liability under Massachusetts UCC M.G.L. c. 106 § 4A
### Breach of Contractual Duty of Good Faith

115.     Mr. Jacobs' repeats the allegations in Paragraphs 1 through 114.

116.     By failing to provide a reasonable security procedure for authentication of the payment orders that initiated the wire transfers, Berkshire Bank failed to adhere to objectively reasonable commercial standards of fair dealing.

117.     Such failure constitutes a breach of its contractual duty of good faith under UCC § 4A.

118.     As between Mr. Jacobs and Berkshire Bank, Berkshire Bank was in the best position to appreciate the high risk involved in serving a customer who regularly performed international electronic transfer transactions involving hundreds of thousands of dollars, and to determine a commercially reasonable security procedure.

119.     Berkshire Bank's failure to provide any such reasonable procedure, or even to alert Mr. Jacobs to the need for such a procedure, failed to meet Mr. Jacobs' reasonable expectations concerning the management and security of transactions with Berkshire Bank.

120.     Upon information and belief, Berkshire Bank does employ measures to provide appropriate security measure to minimize the risk of Internet fraud for other of its customers.

121.     Berkshire Bank did not provide or offer comparable security procedures to Mr. Jacobs, even though it was aware of the high risk nature and size of his fund transfers.

122.     Such failure constituted a breach of the duty of good faith under UCC § 4A and under common law.

123.     Mr. Jacobs suffered damages in the amount of $1,406,000.00 plus interest as a direct and proximate result of that breach.

124.     Berkshire Bank is liable to Mr. Jacobs in the full amount of those damages.

## COUNT V
## **Breach of Fiduciary Duty**

125.     Mr. Jacobs repeats the allegations contained in Paragraphs 1 through 124.

126.     Mr. Jacobs' reposed his faith, confidence and trust in Berkshire Bank to establish and maintain appropriate security measures for the protection of the funds in his Account.

127.     Berkshire Bank, by affirmatively recommending, or by failing to recommend against, email as the protocol for banking communications with it, by failing to provide a reasonable security procedure for authentication of payment orders made by e-mail, and by failing to take reasonable steps to investigate the bounced wire on October, 19, 2016, breached its fiduciary duty owed Mr. Jacobs.

19

128.    Berkshire Bank, by failing to exercise the care of a reasonably prudent person in connection with the sending and resending of wires to Hong Kong without authenticating the transfer orders, breached its fiduciary duty owed Mr. Jacobs.

129.    Mr. Jacobs suffered damages in the amount of $1,406,000.00 plus interest as a direct and proximate result of that breach.

130.    Berkshire Bank is liable to Mr. Jacobs in the full amount of those damages.

WHEREFORE, Mr. Jacobs respectfully requests that this Court enter judgment in his favor and against Berkshire Bank as follows:

a.   damages in the principal amount of $1,406,000.00;

b.   interest on the principal amount of such damages at the highest interest rate allowed by law from the date of the unauthorized transfers until the date of refund or repayment;

c.   reasonable attorney's fees and costs;

d.   up to treble damages for the knowing violation of the Massachusetts EFTA; and

e.   such other and further relief as the Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY OF ALL ISSUES SO TRIABLE**.

December 19, 2016                        JIM JACOBS,
                                         Plaintiff,

                                         By his Attorneys,

                                         **/s/ Lucy Prashker**
                                         Lucy Prashker (BBO# 405330)
                                         lprashker@cainhibbard.com
                                         CAIN HIBBARD & MYERS PC
                                         66 West Street
                                         Pittsfield, MA  01201
                                         Tel:  (413) 443-4771
                                         Fax:  (413) 443-7694
                                         lprashker@cainhibbard.com